We'll hear argument first this morning in case 18-302, Iancu v. Brunetti. Mr. Stewart. Thank you, Mr. Chief Justice, and may it please the Court. The Lanham Act's ban on federal registration of scandalous trademarks is not a restriction on speech, but a valid condition on participation in a federal program. On its face and as applied here, the provision is viewpoint neutral. The scandalous marks provision is one of many content-based criteria for federal registration of a mark's content is essential. Could you please tell me how you're defining scandalous mark? From your brief, I thought you were giving it a different definition than has been used by the agency for a while. Well, the term – the adjectives that have sometimes been used as synonyms for scandalous by the agency are terms like shocking, disgraceful, offensive, and disreputable. I think one – Well, if you use all those adjectives, you run head-on to 10. I think one sense in which we have – I think this has always been at the core of the prohibition, but I think Tam has led us to focus more on limiting the scope of those adjectives. That is, on their face, those adjectives could encompass material that is offensive or shocking because of the outrageous views that it expresses. And we know from Tam that that's – But that's viewpoint discrimination. That's viewpoint discrimination. It's not a valid basis for denial of federal registration of a trademark. So I think it has always been the PTO's focus, but from here on, I believe it will be the exclusive focus on marks that are shocking or offensive because of the mode of expression, not because of the ideas. How is that determined, that a substantial composite of the general public would find the mark shocking or offensive? I mean, if – considering what's involved in this case, if you were to take a composite of, say, 20-year-olds, do you think that that answer would be they would find it shocking? I think not. I think there are certainly some segments of society that are more likely to find particular marks shocking than others. The PTO, its initial determination was that this mark would be perceived by a substantial segment of the public as the form of a well-known word of profanity and perhaps the paradigmatic word of profanity in our language. So why are you using a subjective standard? Why not just something like obscene, vulgar, even profane? But once you get to shockingly offensive, you get to viewpoint. One way or another, it's always subjective. I can deal with a limiting principle that has its own substance, like obscenity. I would agree that if you just looked at the words like shocking and offensive on their face and gave them their ordinary meanings, that they could easily encompass material that was shocking because it expressed an outrageous point of view or a point of view that most members of the Court would agree with. Mr. Stewart, if you agree with that, I mean, what are we supposed to be doing here? Are we supposed to be looking at the statutory words? Are we supposed to be looking at the fuller standards that the Federal Circuit gave to explain those words? Or are we supposed to be looking just at your commitments as to what you're doing going forward? I mean, if you take the statutory words, they're very broad. They do include things that are offensive because of the ideas they express. So why isn't that just the end of the matter? And if Congress wants to pass a statute that's narrower, that's focused on vulgarity or profanity, then Congress can do that. Stewart. I think typically the Court would attempt to construe a Federal statute in a way that would render it constitutional rather than unconstitutional. And I think the scandalous marks provision is at the very least susceptible of a reading that would render it constitutional if the focus is on profanity, vulgarity. And we're not just talking about words. We're also talking about images, that trademarks can include images as well as words. And if the scandalous marks provision were struck down, then applicants would be free to obtain registration of sexually explicit images. You're — this is a facial challenge, right? That's correct. So it's not simply enough to determine that this particular trademark is scandalous, right? That's — that's correct. Well, I didn't understand you in your brief to make much of an argument about that. Well, in part — in part because once you — if you accept the PTO's initial determination that this mark would be perceived as the equivalent of the past participle form of the paradigmatic profane word in our culture, once you accept that, it's hard to see what would be covered if this is not. But I certainly — we it's a facial challenge. The question is whether it is susceptible of constitutional application. We think that Mr. Brunetti's mark was — Whether the — whether the provision itself is susceptible? Of constitutional application. Right. And this provision covers obscenity? It would cover obscenity. Now — So if it's — what would happen if we agreed with the Respondents? Would the whole provision be struck down? I — the Respondents might say that the provision on its face is so — that if the legitimate applications were to obscene materials, the Respondent might say it is so substantially broad — overbroad on its face, covers so much more than that, that it can't be sustained even — So if this is — the entire provision is struck down, the government would not be able to restrict trademarks that are obscene? We — I mean, the government could restrict — without regard to Federal registration, the government could restrict the sale of goods in commerce that can — that — on which were emblazoned obscene trademarks or the mailing of such goods. I think for that reason, to limit it in that fashion wouldn't really accomplish much. We agree that it should be limited so that it isn't viewpoint discriminatory. But to limit it to obscene words, both would render it a virtual nullity. And there's also no good reason that the standard for determining whether a particular mark can be placed on goods that are out in the public marketplace should be the same as the standard for determining whether goods can be sent through the mail to a willing buyer. Let me just be a little more precise. If you lose this case, do you think the Trademark Office would be able to deny registration to marks on the grounds that they're obscene? Well, I think there are certainly ways — if the Court struck down the statute on its face on the ground that it was substantially overbroad, then no. I don't think that there is any other provision of the Trademark Act. It's — Well, and this is — as we've established, this is a facial challenge. Right. Okay. So if you lose, then you would not be able to restrict trademarks on the ground that they're obscene. I think that's — I think that's correct. And — and just so I could understand, you're asking us to narrow this statute to exactly what? To marks that are offensive, shocking to a substantial segment of the public because of their mode of expression, independent of any views that they may express. And — Suppose in the niche market that these goods are targeting, the name is — the word is mainstream. These goods, as I understand it, are meant to attract a particular market. And if we concentrate on that market, from their perception, the word is mainstream. I don't think that would be an appropriate means of proceeding. And let me explain why, if I may. If you look, for instance, at George Carlin's filthy words monologue, the monologue that was at issue in Pacifica, that's a paradigmatic example of profane, copyrightable expression. Now, our society has reached a good accommodation where people who find the Carlin monologue funny or thought-provoking can buy the CDs, they can buy the DVDs. When Carlin was alive, they could watch live performances. All that can be done without forcing the profanity upon anybody who finds it offensive. But what is the standard that you're looking to at bottom? And this is framed by Justice Ginsburg's question. Is — what is Congress's interest? Is it — does it have an independent interest in not having the federal government associated with certain words? Or is it just an interest in following whatever the population thinks is offensive or scandalous or immoral at a particular point in time? Is that not necessarily the same? It is some of both. But with respect to the second interest, we would emphasize the interest is in protecting unwilling viewers from material that they find offensive. And the point I was making about the Carlin monologue is we — there are ways in which that can be made readily available to people who want to see it or who want to listen to it without forcing it upon others. Trademarks can't work that way because the whole point of a trademark is to serve as a source identifier. I don't see how the second interest is implicated much at all because this — this word and all sorts of other words can be used in connection with the sale of goods, even if you're right. They just can't be registered trademarks. So why isn't it exclusively the first interest? Well, it's — it's partly the first interest, but it's partly the second because even though the government cannot prohibit the use of a mark like this on the clothing, it can attempt to disincentivize it or it can attempt to remove the creation — to avoid the creation of artificial incentives to its use by providing the benefits that are associated with Federal trademark registration. And the point — Why are you resisting, Justice Alito? Why can't the government's interest in not being associated with sexually explicit activity or words be enough? We think that it is enough, but we don't want to abandon the — the first interest either because we do think — Why? I'm — I'm curious because Justice Alito is right. Trademarks can be used with or without registration. You get certain statutory benefits, which is part of your government program argument. Right. All right? But — but I'm — I'm just not quite sure why that's more compelling for you. You're defending it in a way that suggests that I'm missing something. I wouldn't say that it's more compelling, but I would say that the government has an independent interest in protecting unwilling viewers to the extent possible from materials that they find — But that falls — that falls pretty to what Justice Alito said, which is now the government is moving with public morals rather than with freedom of speech and the idea that morals can and should change. Well, we — I mean, we do have — in a traditional subsidy program, for instance, if the — the government was handing out grants for aspiring artists, grants to help them — them create art, the government obviously couldn't prohibit — prohibit artists from creating vulgar, profane art, art that a substantial segment of the population would find offensive. But it might still have an interest in encouraging the creation of art that would be accessible and welcome to all segments of the community, including to — to children. And again, the point I was making about source identifiers is the reason that it's not feasible to restrict source — inspection of source identifiers to people who want the product is source identifiers are — they're not the expression that you get once you have decided to buy the product. They are one of the clues that you look at in deciding whether to buy the product. And so a trademark that you only saw after you had bought the package and opened it would fail entirely to serve its intended purpose. The federal registration program is intended to encourage and incentivize the use of distinctive words and symbols that will be made available for inspection by prospective buyers, by members — How do you — excuse me. How do you deal with the problem of erratic or inconsistent enforcement, which seems inevitable with a test of the kind you're articulating? Well, I think some of it is — some of it will be resolved by TAM. That is, to the extent that the PTO had previously taken into account whether the views expressed were shocking or offensive, that won't be done any longer. The second thing I would say is more — more leeway is given in situations — in terms of vagueness, in situations where the government is not prohibiting speech but is simply declining to provide a benefit. Here — here, the consequence of the determination that Mr. Brunetti's mark was scandalous was not that he was subjected to any penalty. He could continue to market his goods and commerce with the — the trademark he had been using. If I understand what you're saying, Mr. Stewart, you're essentially saying we should uphold this statute on the basis of various commitments that the government is now making to apply this statute to only a small subset of the things that it could apply to if you look at it on its face as to just the words used. And — and that's a strange thing for us to do, isn't it, to basically, you know, take your commitment that, look, these are very broad words, but we're going to pretend that they say something much narrower than they do? Well, I think even up to this point, the — the core of the provision as the PTO has applied it has been profane, vulgar — vulgar words, sexually explicit images, offensive excretory references, things that were regarded as offensive. How can — how can one say that when many of these marks have been refused registration on dual grounds? And one ground is that they're scandalous, and the other ground is that they resemble a mark that is already registered. So if the mark is already registered, then it's not scandalous. I think it's anomalous at first glance, but I don't think that there's a logical contradiction, because the Lanham Act doesn't simply prohibit registration of marks that are identical to a — an existing mark. As you say, it prohibits registration of marks that are confusingly similar to existing marks. And it's — it's one of which falls — both of which fall very close to the line, one of which is barely scandalous. Mr. Stewart, though — Go ahead. Justice Ginsburg's point takes us back to Justice Kavanaugh's, I think, which is you look at the seven words at the end of the red brief, and there are shocking numbers of ones granted and ones refused that do look remarkably similar. And how is a reasonable citizen supposed to know? What notice do they have about how the government's going to treat their mark? Well, I think one of the — I think the notice is, in part, the — based on the PTO decisions, but obviously, whatever the court says, if it upheld the provision, the court can say what it wants to say about the permissible — No, but we — we can fix your problem for you. I got that. But — but the government, presumably, the PTO, is supposed to be doing this itself, and without our interference. And it's allowed a lot of marks with these words, and it's refused a lot of marks without these words. I could not myself see a rational line through that chart at the end of the red brief. Is there one that the government's aware of? Well, I think, in part, the PTO looks to context. And a lot of the examples that are given of similar marks, one of which is refused registration, one of which is refused the provision which people will use a slightly different combination of letters that phonetically evokes an existing profane word. So you have marks that use the letters P-H-U-C. And the PTO will, in part, examine context in order to determine, is that mark intended? I don't want to go through the examples. I really don't want to do that. But I can come up with several that are granted, that have phonetics along the lines you've described, and a couple that have been denied. And what's the rational line? How is a person, a person who wants to get a mark supposed to tell what the PTO is going to do? Is it a flip of the coin? I guess the two things I would say are, first, the PTO looks to context. And so if a phonetic word like the one I've described appears in a sentence or in a phrase in which the profane word would commonly appear, the PTO is more likely to conclude that a substantial segment of the public will regard that as the equivalent of the profane mark because it is being used in the way that the profane mark is often used. If this is held to be unconstitutional, what is going to happen with whatever list of really dirty words still exist and all of their variations? There's going to be a mad scramble by people to register these marks. And the ones who get there first are going to have exclusive. They're not unlimited. There's going to be, those who get there first are going to be the ones who have these. I mean, there are other barriers to trademark registration. That is, it's not the case that any nonscandalous word could be trademarked. It has to be the sort of word or the sort of phrase, if it's verbal, that consumers would perceive as identifying the source. And so short phrases or slogans are often refused registration on the grounds that they would be seen by consumers as communicating a thought, not as goods. And there is also the requirement that people who want to register their trademarks be using the mark in commerce. A person can't simply register a mark and sit back and wait for people to pay license fees in order to, people who want to actually use it in commerce to pay license fees. It is a prerequisite that they be using the mark in commerce. So there are some limitations. But, yes, you would think the natural result of flow of registration applications. And, again, this is not just for words. This is for visual depictions that are intended to signify the source of a product. Breyer. What about racial slurs? Stewart. I think in general, racial slurs are taken off the table by TAM because it is the — Breyer. Because I've looked into it a little. And there are certain ones that have exactly the same physiological effect on a person as the word we're using here. And there is a physiological effect. Stewart. I — Breyer. There is a — it's stored in a different place in the brain. It leads to retention of the word. There are lots of physiological effects with very few words. It's not too hard to think of a racial slur that has exactly the same effect. Stewart. Agreed. I think there is one racial slur in particular that would be a close call even under our basic framework of you can't deny registration based on the views expressed, but you can deny it based on the mode of expression. You could say this particular racial slur is considered uniquely offensive even as compared to other racist speech. And, therefore, it could be denied registration on the ground that it was an impermissible mode of expressing a racist thought. On the other hand, you could argue at bottom the reason that this slur is regarded as so offensive is that it has historically been linked to virulent racist attitudes. And, for that reason, it all comes down to viewpoint. We think that would be an authentically close case even under the framework that we've established. But, again, there's no sense in which the mark that is at issue here could be considered offensive because of any view it has expressed. Really, the argument on the other side is more it isn't offensive at all, not it is offensive because it is perceived as communicating a particular message. Roberts. What about Mr. Brunetti's argument that the use of the word expresses a viewpoint precisely because of its offensiveness? You know, it's edgy, it expresses a nonconformist attitude, all of that. I don't deny that that might be a reason that people would use profanity in certain circumstances, but I think if that were treated as a form of viewpoint discrimination, it would really cast doubt on a lot of other practices. For example, we've indicated in our brief that under Mr. Brunetti's theory, if the government had — if a municipal government operated buses and rented out advertising on the buses but precluded the use of profanity on the advertisements, if the use — if an applicant could say, as Mr. Brunetti is saying, I want to use profanity because it communicates an edgy message, and I think the government legitimately should be able to say that may or may not be so, but we don't want profanity on our buses where they're visible to unconsenting adults and children. We don't want that word on our buses regardless of the message that you intend to convey, and we think that would be sufficient to make the provision viewpoint neutral. You keep talking about this as a government program, and Tam addresses this and says it's an odd government program because people are paying you to give the service. You're not giving them much of anything except leaveable rights, which are not unimportant, but I'm not sure how to differentiate this from a limited public forum as we recognized in Cornelius because, as in Cornelius, registrants can go out and use the trademark. They could have sought donations from whomever they wanted in Cornelius, and yet we talked and we held that the list of organizations was the forum. You haven't argued very forcefully that this is a limited public forum. Why? I mean, I think we don't regard it as a limited public forum because the registration program gives significant commercial benefits to registrants, but getting the mark on the PTO's principal or supplemental register is not the way in which Mr. Brunetti would want to communicate with his potential customers. The way in which he would communicate with his potential customers is by putting the world on notice of his mark. It does. And it gives him the legal protections that come from that notice. Without it, he can't enforce any Federal rights. So he needs registration to be able to do what he wants to do. And we think essentially the same legal standards should apply to the restrictions at issue here as would apply to a limited public forum. Our only point, the reason we haven't argued that it actually is a limited public forum is that the register communicates not so much with Mr. Brunetti's customers but with potential infringers, people who might otherwise be tempted to use the same mark on their goods. Now, a couple of other things that I'd like to say about the registration program. You're right that people pay a fee to register, but the PTO still devotes substantial resources to examining the trademarks, to publishing them. There are periodic, there's a periodic reexamination to see whether the applicant is still using the mark in commerce. And the commercial advantages that registrants get are directly attributable to the efforts that PTO has put in. For example, the reason that it makes sense to treat trademark registration as prima facie evidence of the trademark's validity and the registrant's ownership is that the PTO has examined the materials and has made that determination. The reason it makes sense for the trademark to become incontestable after five years is that the PTO has published the trademark. Anyone who thinks that there might be a problem with it has an opportunity to see that the mark has been claimed and to raise an objection. And so if a person doesn't do so within five years, it's fair to treat the mark as incontestable. If I may, I'd like to reserve the balance of my time. Roberts. Thank you, counsel. Mr. Sommer. Mr. Chief Justice, and may it please the Court, there's two important points to be made. First, the government does not defend the plain language of the statute, nor does it defend how it's been consistently interpreted for the last 70 years. Rather, it asks this Court to validate a hypothetical statute not enacted. The second point is, is a substantial number of Americans think that gambling, drinking, eating some types of meat, eating meat at all, is immoral. A substantial number of Americans as to abortion, gun control, immigration, or two political parties, a substantial number think that those are the con is immoral, and a substantial number think that the pro is immoral. There's simply no way to make a reasonable determination between those that come in and those that must stay out. There are books and scientists' reports and so forth, I don't know how, I haven't seen them contested, that say take six or seven words, and today, in the past they might have been religious, but today they do include the word at issue and they do have a psychological effect on the brain, they're stored in a different place, they make a difference in the conductivity of your skin, which shows emotion, and above all, they are remembered. And therefore, take that set. Now, as if it's in a context where it has that effect, for most people, why isn't that a pretty clear distinction from what you're talking about, and why doesn't the government have a right to say, this is a commercial matter, purely commercial, it is totally free to use any word you want right next to this registered trademark, we just don't want to be associated with it? Well, if you're asking about the government association, the Tam Court dealt with that already. I wasn't. I was asking primarily about there is a way of distinguishing these matters, I think. But I wouldn't ask you if I were certain of the answer. Well, if you're suggesting that there's a content-neutral way of deciding which marks are too scandalous to register by doing a test on the body. You don't have to do that. It's not too tough, you know. I mean, most people know what words we're talking about. And of course, you could come in and show they're all wrong on this, but they probably aren't. But that avoids the issue about whether this is viewpoint. And even if it's not viewpoint, it's still content. So if this statute clearly covers, the government does not seem to dispute that at least many or some of the marks that are both granted and refused express viewpoint, then the statute is overbroad. Well, suppose the statute didn't say what it said. But suppose the statute in fact said what Mr. Stewart says the PTO is going to do going forward. In other words, the PTO is not going to touch ideas that are offensive or scandalous or immoral or anything like that. It's just going to focus on modes of speech. And essentially what that means, let's just – is it won't allow trademarks that are profane. Well, the first question – Is that viewpoint-based? Yes. Because if you want to have a statute that prohibits profanity, obscenity, that would not be constitutional. In fact, I'd like to sort of answer one of the previous questions, is even if the statute is struck down, the PTO still can refuse obscene trademarks, because Section 1 requires that the trademark needs to be used in commerce, and that's always been determined to be legally used in commerce. Well, our standard for obscenity is so high, I can't believe that many trademarks would really qualify as – as obscene. But let's say that the government has a real interest in preventing a certain kind of just profanity, vulgarity, nothing to do with the viewpoints of speakers, but something to do with the way they express those viewpoints. I guess that – that a little bit stacks the deck in terms of – of the question. But why would that be viewpoint-based? Well, if you're talking about the mode of expression argument, that is a misreading of Cohen, because Cohen could have said phooey on the draft. And that's what the government says he should have done, and if he said something else, he should have been arrested and his conviction should have been affirmed. But we know his conviction was reversed. So the mode of expression argument is incorrect. Well, it's – Cohen rejected it in that context, where somebody was being punished for – for saying the words. But is it a little – isn't it – is it exactly the same here? I think so. The government is not saying you can't use this phrase, this word. We just won't register it. Well, if you're – if – basically, the question seems to be, is can we prohibit the seven dirty words? And if the government had a list of seven dirty words, would that be constitutional? And the answer is it would be not for two reasons. First, because you've seen in the brief some marks that have the F word and racism and cancer. Those clearly express viewpoints. And the second thing is, even if you had a list of five words, that wouldn't preclude Mr. Brunetti's mark because it isn't exactly one of the seven dirty words. Oh, come on. You know, come on. Well, I agree with you. Be serious. We know what – you know what he's trying to say. So it's – you'd have the seven dirty words and anything that – you know, any clever way of trying to say it in a different way, using different letters. But that's my point, because F-C-U-K is granted and F-V-C-K is granted.  And the only reason – It's been – it's been inconsistently applied. But let's say we're going forward and there's a list of words and you just can't use those. And your position is that would be unconstitutional. I think so. If Congress were to pass that, we'd be here again in a few years to determine whether that's true. Your basic point, and this is where I'm having a harder time, I think we're in a period where swear words – and that's what they are, swear words – where their content is changing so that younger people feel that these racial slurs are just as bad, if not worse. So suppose that you can pick that out. Sometimes it will be used to convey a message. I grant you that. But this is business. And it's not only business. It is business that has a function of identifying the manufacturer. And it is the kind of use that doesn't forbid anybody from using that word except to get registration, and he can put it right next to it. So it's very different than Carlin. It's very different. Now, I want your response to as much of this question as you can give me. I'm sorry. I don't really know where to start. I didn't think you necessarily would, because there are several things mixed up there, and I want in my mind this straightened out. Well, I think you agree that it's a viewpoint, because I'm not looking at it from the viewpoint. No, I don't agree with its viewpoint. I think that very often the word involved in your case and the racial slur is not viewpoint. It is used to insult somebody, rather like fighting words, or it's used to call attention to yourself. That's the purpose of the slur. That isn't viewpoint. Fighting words isn't viewpoint. Or if it is, it's overcome. Well, Mr. Brunetti's viewpoint is, as already pointed out, I can be offensive. I don't have to obey the authority. And that's viewpoint. I don't want to distract you, but that's completely circular. It's like saying my protest is that I want to use words prohibited by, you know, not given trademark protection. And because I have that viewpoint, you have to give them trademark protection. That's totally circular. Well, if we're doing to have a facial challenge here, so the question is, is it overbroad? And it doesn't matter if Mr. Brunetti's mark should be granted or not. It's the statute as written and as applied, without exception, covers a fair amount of clearly core speech, of high-value speech. And you're saying that it's not. That's a different argument, and I see that argument. I'm not asking about that because I think I understand the argument. But I am, what I am worried about is the viewpoint, as you say. But I'm also worried about the racial slur we all know about, okay? Suddenly, in certain places in the United States, appearing as a product name, appearing on every bus where it's advertised, appearing on newsstands in Times Square where it wouldn't be, but it might be in some other city, and where children and others see it. Now, that's the interest that they're talking about at the same time. As they point out, this doesn't stop anybody from saying, it does stop them from claiming it's a registered trademark, i.e., product source recognized by the government. Now, that's what I'd like you to deal with directly. Well, just granting Federal registration doesn't require that anyone use a trademark, and my client's goods are not going to be at Target and Walmart. Well, I'm not sure that's an answer to Justice Breyer's question. Why isn't it a government benefit? And why can't the people choose to withhold the benefit on the basis that there are certain words that are profane, and that we, as a matter of civility in our culture, would like to see less of rather than more of? And you can use, you're free to use them. Cohen can have his T-shirt. But we're not going to trademark them. And we've held just last year that a patent is a public benefit that can be withdrawn without a judge. Why isn't this also, similarly, a public benefit rather than a private right? Well, I would respond with 44 Lickermart, because the government doesn't have to grant the benefit. For example, the government doesn't have to have a fire department. But it can't go to a church and say, we're not going to protect your church unless you drop your Santeria beliefs, because we find that offensive. And I think that's a good analogy. Sotomayor That's viewpoint. Why is it that the government can't say? As it does with every registration system, you can register your marriage, but we don't permit people to declare their love in their marriage license. We just ask for their name, their address, who are the witnesses, and where the marriage happened. The same things with a deed to a house. We don't permit you to have commercial advertisements in that deed telling people how wonderful your house is. Weets and bounds. The date, the purchase price, and that's it. So why can't the government, just like with a patent, say, we will give you this benefit to these things, but not to others? But we don't want profane words, no matter how you use them. Whether it's pro or con any idea, we don't want vulgar, profane, sexually explicit, or other words. Now, we've got a separate problem with the lack of consistent application by the government. We'll put that aside. But let's deal with the basic question. Why can't the government say, no, we're not going to give you space on our public registry for words that we find are not acceptable? Well, I think you've explained why it's not a public forum. It's not a forum at all. And, in fact, would the government be allowed to refuse registration of ownership of property because it's bought by a church with a name that's considered offensive? Could the Coast Guard refuse to register a boat because they think the name of the boat is a little bit salacious? Actually, they might. Maybe. But, I mean, the government's interest, you say that, you know, this product's not going to be in Wal-Mart, right? Correct.  And, you know, for parents who are trying to teach their children not to use those kinds of words, they're going to look at that and say, well, look at that. And then, you know, they're going to see the little trademark thing and say, well, it's a registered trademark. Well, they won't say that. But you understand my point, is that the government's registration of it will facilitate its use in commerce, not necessarily as speech, but as a commercial product. And that has consequences beyond, regardless of where the product is sold. Well, I think that's where the government has a conundrum, because the government has a, assuming even if it's only intermediate scrutiny, doesn't have a compelling interest if it can't stop people from using it. And so people, Mr. Brunetti can still use his mark regardless of whether it's registered or not. I know, but the whole point is that the Federal registration increases the exposure. You're going to have more commercial, the theory anyway, is you're going to have more commercial opportunities and markets and if you do use, if you are under the Federal registration system. I mean, that's the government's argument. You can do whatever you want with it. You're just not going to get the benefit of the government's participation in promotion of vulgarity. Well, that gets back to why the statute was unconstitutional from the beginning, because the legislative intent shows that the Congress recognized it couldn't prohibit use of vulgar marks. But it's, the legislative history says that, well, we can deny registration and that will prevent them from using it. What is your answer to Justice Breyer's comment that insulting someone is not a viewpoint? Well, I would agree that all the traditional exceptions to the free speech, such as fighting words, is not expressing a viewpoint. But as to insulting someone being viewpoint, you decided that unanimously in town. Tam is a word, Tam, they were using a word that doesn't have, for whatever reasons, it doesn't have this tremendous retentive power that would lead someone to try as quickly as possible to get his brand registered with that name in order to grab attention. And there are such people. And that is not a word in Tam. That is not that kind of a word. It was used ironically. It was used ironically for perhaps a politically oriented purpose. I don't know that I've just articulated much of a distinction. But there may be something there, and I again want to hear your response. Well, since Tam, the trademark office has taken the position that it cannot refuse any racial slur. And, in fact, is approving them. But even before Tam, there were variations on that racial slur registered. What about Mr. Stewart's comment about public buses' ad space that he says would not be able to be regulated if you were to prevail here? Well, I guess sort of, I hope this isn't too flippant, but you have considered whether to grant cert on that question. But I don't think that profanity always expresses viewpoint. In a trademark context. When does it not? Well, fleeting explicatives. And I think when it's used without any relevance to the subject matter, such as in high school speech. And, of course, there still can be. Some of us would say that a vulgar word with relationship to selling clothes is sort of irrelevant. Well, it's not irrelevant because, as Justice Ginsburg pointed out, the audience that Mr. Brunetti is appealing to is young men who want to be rebels. And this is how they do it. Well, that may be the audience he's targeting, but that's not the only audience he reaches. Agreed. Well, I mean, but that sort of gets to the government's interest in whether or not it wants to be associated with facilitating this type of vulgarity which reaches the whole – I mean, I guess you would say the whole point is to reach beyond the targeted audience to offend people. Well, under your – under the Court's jurisprudence, if this is strict scrutiny or even if it's content regulation, that's not a compelling government interest. And that sort of falls afoul of Reno v. ACLU that says we can't take our level of discussion in our diverse society that includes, for example, rappers to the – Well, but everything – I'm sorry. Go ahead. To, you know, the lowest common denominator, the most squeamish among us. No, but the point – this is a different type of program. The whole point of this program is to regulate content. You have to look at it and decide. Is it, for example, functional or descriptive, in which case it doesn't get protection? Is it something that's been granted before so it doesn't get protection? The fact that it's – it is. I'll concede it's completely content-based, but it's the nature of the program. Well, it's not a program. It's a registration scheme, and it is not content-based on most grounds. Likelihood of confusion deals – and the deception clause deals with confusion and fraud, basically, which is – You would agree that there are other content restrictions, wouldn't you? You know, the flag one or – you know, there are a number, yes? Well, I think that 2b, which deals with flags and symbols, and 2c, with using people's names, could under certain circumstances raise constitutional issues. I think 2e, which deals with things that aren't trademarks because they're generic or functional, I don't think that's called into question. You think likelihood of confusion is not content-based? I think – How do you determine whether something is likely to confuse without looking at the content of it? Well, I would say not only content-based, but I'd also say that that is the traditional exception of preventing confusion, because the whole point of refusing the new application is it's likely to be confused with the other one. But you're actually not – it's almost like a secondary meaning case like City of Renton, because you're looking at Applied Mark A and Registered Mark B, and you're not looking at the content. That's really irrelevant. You're only looking at the likelihood of confusion, the similarity. With respect to words and letters as opposed to images, is there any combination of words or letters that you think can be barred under the scandalous immoral provision? Well, I think constitutionally only obscenity can be barred, and it would be – And what would you – with respect to words and letters, how would you define obscenity in this case? Well, I would just use Miller v. California, because the government basically is arguing here we should ignore Miller v. California or modify it or create a new exception to the First Amendment for Volger. So a picture I can see can be obscene, and I can see if you had a long sentence that said some things, which I don't need to give you an example, but you could imagine a sentence or two that could be purient interest and – But that gets to the question of how do you draw the line between this and that. Well, the Court has been satisfied with the obscenity standard since 1970-whatever for Miller v. California. And I think that's a good standard. I think that's settled jurisprudence. But what do we do about the fact this is a facial challenge, and so at least some of this material would presumably be okay even under your test for the Trademark Office to refuse? Only – I'm contending that only obscenity could be refused properly. Well, but isn't in a facial challenge, your obligation is to prove that the statute is unconstitutional in all of its application or almost all of it? Well, for vagueness, but for overbreath, I believe it's only necessary to show that it covers a substantial amount of speech. Well, but a very substantial amount of speech. Where's the line here? Well, that's why it's unconstitutional, because it covers religious speech. I've given you an example of religious controversial marks that are refused. I've given you an example of political marks that have been refused, as well as profanity. And the government can't even get that right, because some – Well, but assuming profanity is borderline, right, and some of it might be okay for the government to regulate and some of it might not be. Let's just assume that. Have you met your burden? I believe so, because I have shown that there's a substantial amount of speech that is improperly refused under this provision. And the provision is so incredibly overbroad, because if it's taken at its – on its face, steak and shake can't be registered, because some people believe you can't – a substantial portion of Americans believe that eating beef is immoral. And so now that's unconstitutional. That's invalid, that registration. I'm not sure you answered my bus question, so I want to get it one more time. If we rule for you in this case, is there a principled ground on which we could distinguish public bus ad space? Definitely, because that is a public forum. And I think that the – probably the clearest way is public disruption. But I do see – Public what? Disruption. Because people see a word and all of a sudden can't handle themselves? I don't understand that. And there's also a case that involves where bus – affirming standards for taking ads, because the purpose of the bus program is revenue. And I think it's from Massachusetts, but I can't remember the name of the case. Can you explain the disruption point more? Well, I'm not sure – at least in the high school context, like Bethel School, I think that there is disruption. On a public bus, how would the – Okay, I'll withdraw that. I think that might be hard to draw a line there. Well, if there's no further questions, I would simply say – What about where – there may be words that are almost never used actually to express what the word literally means. They – and the word your client wants to use is number one on the list. Like 99 percent of the time or 95 percent of the time, it's not used to express what the word literally means. It's just used to say, I'm mad, I want to get attention. It's like shouting. Can it be – can that be distinguished on that ground that it doesn't express any sort of viewpoint? All it expresses is an emotion, a way of expressing something. Well, I think two responses. One, I think you've already decided that issue in TAM by unanimously holding the giving offenses viewpoint. No, I – well, TAM involved the expression of an idea. And so there was viewpoint discrimination. Well, because of your decision in TAM, the provision in the whole is invalid. And so all those racial slurs are coming in. So what exactly is the harm to the First Amendment speech interest here? I mean, this is, after all, simply not forbidding the use of any word in any place, but you can't put a little R next to it. It doesn't stop you. The registration, non-registration makes it more difficult for you later to prove a trademark case, a trademark case being about the source of a product, not about speech. So what precisely is the harm? I'm not saying there isn't one. I just want to get your words of what the harm to the interest, the First Amendment interest is. Because people who want to, like Mr. Brunetti, who want to have a somewhat undefined viewpoint, or people with a more defined viewpoint, like in the cancer and the racism case, they have a viewpoint that they want to make. And as the Court already held in TAM, denial of – if denial of registration in TAM is a sufficient burden to raise constitutional law. I understand your TAM. That's why I wanted to get your articulation in best words, since the statute books of the Federal Government, as well as every State, are filled with prohibitions against saying all kinds of things in areas of commerce, securities, you name it. I mean all kinds of things. So what I want your words for is to distinguish this case in terms of harm to First Amendment interest. All I want is your phrase on that. And I'm not saying you don't have one. I just want to get it in my head. I would say Brunetti cannot express his viewpoint without an unconstitutional burden. See, I take it that the correct spelling of the vulgar word at the heart of the case, that can't be trademarked, right? The bad word itself? Yes, it could be. Someone could register that if they used it as a source identifier, like as a label in the neck. That would be a source identifier. Because the one thing I think maybe is being confused is the use on the front isn't a trademark use. That's considered ornamental. Trademark use is a use on the neck label or, as the government likes to ignore, on blogs, like say if you want to say dump the governor, except we can have other examples that would fall under that. But I guess I don't understand. A mark on the neck? See, the trademark is on the neck label. And the statute says any word or symbol can be a trademark, unless there's a disqualifying condition. But trademarks also are more than just the neck label. Because people use it for political parties, for charitable groups, for providing information about candidates for public offices. This is not, trademarks and service marks are not purely commercial anymore. They were back when Paul Revere put his name on silverware. But if it was nowadays, Paul Revere would say, I write for freedom. And that would be viewpoint. Well, if the Court has no further questions, the government doesn't dispute, I think, that some marks are viewpoint. It doesn't dispute that it's content regulation. And the government does not dispute the statute doesn't provide strict scrutiny. And therefore, I submit the statute is facial and constitutional. Sotomayor, you're conceding to the Chief Justice that anyone who uses the words on goods to sell them can use any profane word and register it. Well, there's two questions there. Can they use it? Because all the words about descriptive use, non-trademark use, apply. So people can use, let's say someone has the word apple registered for clothing, but they still, someone else could use an apple on the front of the clothing. And so that's non-trademark use. And so all those rules that are. But the word that the Chief asked you about, you say can be registered. I believe it can. If it's on the neck. Yes, I believe so. I think I understand your difference, but. All right. Thank you. Thank you, counsel. Four minutes, Mr. Stewart. Thank you, Mr. Chief Justice. I'd like to make one factual clarification and then three quick legal points. First, as to the PTO's current practice with respect to racial slurs, in general the PTO views TAM as prohibiting a denial of registration for racial slurs. But with respect to the single most offensive racial slur, the PTO is currently holding in abeyance applications that incorporate that word pending this Court's decision on to leave open the possibility that that word might be viewed as scandalous. Second, with respect to Cohen, Cohen simply illustrates the difference between a prohibition on speech and on content-based restrictions on speech that are used to prohibit and content-based criteria for government benefits. The reason that the law in Cohen was held to be invalid was that it entirely prohibited the use of the word in a public space. Here we're not doing that. The second thing I wanted to say, and this follows up on questions from the Chief Justice and Justice Alito, that content-based distinctions are really ubiquitous in the registration program. We look to see whether marks are descriptive, whether they're generic, whether they're confusingly similar to existing marks. And often the words that we find to be descriptive, generic, confusingly similar are incorporated into what could be viewed as messages. And in response to any allegation of viewpoint discrimination, we would say we're not denying registration because it is being used to convey this message. We're denying registration because it is descriptive, generic, et cetera. And we simply want to be able to follow the same approach with respect to profanity. Profane words can be used as part of a larger message, but we're not denying registration because of the message. It's because of the profanity. And the last thing I'd say about whether it matters. Obviously, the reason Mr. Brunetti cares about this enough to apply for Federal or trademark registration and appeal to the Federal Circuit is that he believes that Federal registration will convey commercial advantages. And within the context of a program that is intended to facilitate and strengthen trademarks, Congress can legitimately decide that it wants to disincentivize the use of trademarks that substantial numbers of people would find offensive and to disassociate the government from those trademarks. Thank you. Roberts. Thank you, counsel. The case is submitted.